THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY L. BARNARD, Defendant-Appellant.

Fifth District    No. 5—89—0350

Opinion filed February 21, 1991.

Robert Agostinelli and Peter A. Carusona, both of State Appellate Defender's Office, of Ottawa, for appellant.

David W. Hauptmann, Special Prosecutor, of Harrisburg (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, and Joseph Roddy, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, Gary L. Barnard, appeals from a judgment entered by the circuit court of Saline County on May 26, 1989, following his conviction by a jury of the offense of involuntary manslaughter for the

shooting death of Dennis Price. Defendant was initially charged by information with the offense of murder. The jury was instructed on the offenses of murder, voluntary manslaughter and involuntary manslaughter. Defendant raises two issues on appeal: (1) whether the trial court erred in submitting to the jury two State-tendered instructions relating to an initial aggressor's limited right to use force in self-defense; and (2) whether the trial court erred in refusing to submit to the jury defendant's tendered instruction on the right to use force in defense of dwelling.

The following evidence was adduced at trial. On the evening of June 15, 1981, Bill Adams was working for the Harrisburg police department as a dispatcher. At approximately 7:45 p.m., he received a telephone call from an individual identifying himself as Gary Barnard. The individual told Adams that the police had better come to his residence because he had just shot Dennis Price. The individual gave his address and asked that an ambulance be sent. Adams dispatched a police unit to the address.

Leon Stull testified that on June 15, 1981, he was chief of the Harrisburg police department. At approximately 7:45 that evening, he received a report over his car radio of a shooting at defendant's address. Stull proceeded to that address and approached the house. The door to the house was open, and through the screen door Stull could see a body lying on the floor, a person standing in the doorway between the kitchen and living room and a person sitting on the arm of a chair. Stull entered the house and asked who the individual on the floor was. Defendant responded, "Dennis Price." Stull asked who had shot him and defendant responded, "I shot him. I got tired of them arguing." Stull asked where the gun was, and defendant handed it to him. The gun contained eight live rounds of ammunition and one spent cartridge, indicating one bullet had been fired from it. At that time, other police officers and an ambulance arrived. Price was transported to the hospital. Defendant and the other individual, identified as Larry Moore, were transported to the police department.

On cross-examination, Stull testified that defendant would have been able to see him approaching the house through the screen door. Stull was in uniform that evening. Defendant made no effort to flee, but was fully cooperative. Stull testified that Larry Moore was extremely drunk. The ambulance attendants indicated that Price still had a weak pulse when they arrived. Defendant did not appear to be intoxicated at all, nor did he appear upset.

Stull did not see any weapons on the person of or near the body of the victim. However, Stull did not search Price's body for con-

cealed weapons.

Kenneth Childers testified that on the evening of June 15, 1981, he was employed as a police officer for the City of Harrisburg. He interviewed defendant at the police station following the shooting. Defendant told Childers that at approximately 6:45 p.m. on June 15, 1981, Dennis Price, Stanley Jackson and Larry Moore had come to defendant's home. They had been drinking. After a few minutes, they left to get something else to drink. Defendant was afraid they might return and cause trouble so he went to his bedroom, where he loaded a .22-caliber revolver and placed it on his bed. He then proceeded to watch television. A short time later, Dennis Price and Larry Moore entered defendant's house. Stanley Jackson remained in the car. For approximately 30 minutes, Price and Moore argued with each other, sometimes quite loudly. Defendant was concerned that they were disturbing his neighbors and asked them to be quiet. Defendant also repeatedly asked and told Price and Moore to leave, but they refused. Defendant then went into his bedroom and got the gun. He came back and again told Price and Moore to leave. Price got up from the chair in which he had been sitting and started walking toward defendant. Defendant pointed the gun at Price and said, "I told you to leave." Price repeated, "You don't want to do that. You don't want to do that." Price was holding his hands up at approximately the level of his head. When Price had approached within six feet of defendant, defendant shot him once in the chest. Defendant had not seen any weapons on Price, Price did not have his fists clenched like he was going to strike defendant and Price had not verbally threatened defendant. Defendant stated that he shot Price because he was afraid of him. After making this statement, defendant was arrested. Defendant had been cooperative in making the statement.

The Saline County coroner testified that an autopsy was performed on the body of Dennis Price. It was concluded that Price died as a result of shock from massive blood loss due to a gunshot wound to the chest. The autopsy report included a toxicology report which indicated that Price's blood-alcohol level at the time of death was .268%.

The victim's father, Ted Price, testified that his son was 5 feet, 9 inches in height and weighed 110 pounds. The victim had no use of his left hand and fingers as a result of an accident. The State rested.

The defense called officer Kenneth Childers to testify. He testified to the victim's reputation in the community for violence. He had known Price since grade school and knew him quite well. Childers also knew Price in his capacity as a police officer. At times Price dis-

played violent behavior.

Ted Dowdy testified that on the afternoon of June 15, 1981, Dennis Price visited his home with Larry Moore. Price kept trying to start a fight with Moore. Neither Price nor Moore had any scratches, cuts or bruises at that time. Dowdy was not acquainted with the defendant.

Defendant testified in his own behalf. On June 15, 1981, defendant was living alone in a home owned by his father. At approximately 6:45 that evening, Larry Moore's car pulled up in front of defendant's home. Defendant walked out to the car and saw Larry Moore, Dennis Price and Stanley Jackson in the car. They engaged in conversation. Moore, Price and Jackson were "just out drinking." Defendant testified that Price had a "crazy look on his face *** like he was mad at the world." Price had a large bloody spot on his arm which appeared to be a recent wound. Price's shirt was badly torn. Defendant assumed Price had been in a fight. All three men appeared to be intoxicated. The three men left to get another drink. Defendant felt afraid of them. He had read in the newspaper that Price had once made a bomb threat to the police station, and had heard that Price had been involved in a knifing. Defendant had heard rumors about Price which made him fear Price.

Defendant reentered his house. After a few minutes, he became concerned, so he went into his bedroom, where he kept a gun. He loaded the gun and placed it in a cabinet in the headboard of his bed. He closed the door to the cabinet. Defendant had never used the gun before. Defendant then returned to his living room to watch television.

Approximately 15 minutes later, Moore and Price entered his house. Defendant had not invited them in, nor had they asked permission to enter. Price and Moore began to argue with each other. The argument became very belligerent and loud. Defendant was concerned that the neighbors were being disturbed. Price and Moore were using profanity and appeared to be intoxicated. The argument continued on and off for 30 to 40 minutes. At one point, Price got up and approached Moore and became quite loud, as if he wanted to fight with Moore. Price told Moore, "Let's just draw on it." Defendant understood this to mean that Price might draw a gun, as Price was known to carry a gun.

Defendant noticed a large bloody spot on Moore's leg and asked Moore about it. Moore responded that he had hurt his leg while fighting with Price, and threatened to fight with Price again. The wound was fresh, as if it had happened that day.

Defendant was afraid that they might involve him in the argument or fight. At one point, Price ordered defendant to get him a drink of water. Defendant complied.

After a while, defendant told Moore and Price that they would have to leave. They did not respond. Defendant told them again that they would have to leave, and they still did not respond. Defendant went into the bedroom and got the gun. He returned to the living room. Defendant was afraid. While holding the gun, defendant again told Price and Moore to leave. Defendant did not observe any weapon on either Price or Moore; however, he feared that Price might have a gun concealed in his cowboy boots. Defendant had heard that Price often carried a concealed gun. Price got up from the couch where he had been sitting and began walking toward defendant. Price had his hands up near his head, and defendant feared Price was going to grab for him. Price repeated, "You don't want to do that, man. You don't want to do that," in an angry tone of voice. Price continued walking toward defendant. Defendant feared that Price was going to jump on him. When Price got within six feet of defendant, defendant pulled the trigger in an effort to stop Price. Defendant fired only one shot, although the gun was loaded with nine bullets. Defendant did not intend to kill or hurt Price when he fired the gun. Defendant immediately called the police and requested an ambulance for Price.

On cross-examination, defendant testified that when he was in the Army, he had been awarded a marksman's medal for use of an M-1 rifle. Defendant was not aiming the pistol when he shot Price, but was hoping to hit him in the shoulder. Price did not verbally threaten defendant, nor did he have his fists clenched as he walked toward defendant. At no time did defendant attempt to leave the house or telephone for help.

Robert Vernon Cole testified that he was acquainted with Dennis Price. He testified that on one occasion, while at Cole's home, Price attacked him with an iron poker because Cole had told him to stop using the phone. Price had been telephoning different girls, screaming and cursing at them and using vulgar language.

April Henshaw testified that Price had been married to her mother. April had lived with them. Price would get drunk three or fours days a week. When he had been drinking, Price would become belligerent. He sometimes shot his guns at the ceiling or floor. One time, Price shot the gun in the direction of April. She felt the bullet pass by her head. Price sometimes beat April's mother.

Defendant introduced an Illinois Department of Public Health toxicology report which indicated Price's blood-alcohol level was .268% at

the time he died. The defense rested. The State offered no rebuttal evidence.

At the instruction conference, defendant tendered his instruction number 13, which is Illinois Pattern Jury Instruction, Criminal, No. 24—25.07 (2d ed. 1981) (hereinafter IPI Criminal 2d), on the use of force in defense of dwelling. As tendered, that instruction reads:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to terminate another's unlawful attack upon a dwelling.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if

the entry is made or attempted in a violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon himself or another then in the dwelling;

or

he reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling."

The State objected to the instruction, arguing that there was no evidence to indicate an attack upon defendant's dwelling, or that entry was made in a violent, riotous or tumultuous manner or to commit a felony. Defendant argued that he had acted to prevent Price from committing an aggravated battery, a felony. The court denied the instruction, stating that the instruction was not intended for a situation such as this.

The State tendered its instruction number 13 (IPI Criminal 2d No. 24—25.11), which reads:

"A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person."

Defendant objected, arguing the instruction was unsupported by the evidence. Defendant argued that he did not provoke the use of force against himself, because there was never any force used until defendant fired the gun. Defendant argued that the shooting was not in retaliation for an act of force by Price, but was to prevent Price from committing that act of force. The State argued that defendant provoked Price by the act of getting the gun. The court agreed with the State, finding that defendant's act of getting the gun could be interpreted by the jury as an act of provocation.

Finally, the State tendered its instruction number 12 (see IPI Criminal 2d No. 24—25.09), which reads:

"A person who initially provokes the use of force against himself is justified in the use of force only if,
(1) the force used against him is so great that he reasonable [*sic*] believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

The State argued that, because defendant had tendered a self-defense instruction, which the court had agreed to give, there must be some evidence of an act by the victim which the jury could interpret as an act of aggression. Thus, the State argued, it should be allowed to give its instructions numbers 12 and 13. Defendant countered that there was no evidence of the use of force by Price against defendant. The court initially refused to give this instruction, stating that it did not believe the evidence supported the theory that defendant initially provoked the use of force against himself by brandishing the weapon. However, after hearing argument on whether to give State's instruction number 13, above, the court reconsidered and agreed to give State's instruction number 12. The court held that the act of brandishing the gun was at least the threat of the use of force by defendant and, if done with the knowledge that Price might react a certain way, justified the giving of State's instruction number 12.

Closing arguments were heard, the jury was instructed and, after deliberations, the jury returned with verdicts of not guilty of murder, not guilty of voluntary manslaughter and guilty of involuntary manslaughter. The court sentenced defendant to a term of imprisonment of five years. Because defendant had already served that time by the time of trial, he was immediately discharged. Judgment was entered May 26, 1989.

Defendant's first argument on appeal is that, since the evidence at trial did not support a finding that defendant had initially provoked the use of force against himself, the trial court erred in giving State's instructions numbers 12 and 13 (IPI Criminal 2d Nos. 25—24.09, 25—24.11). Defendant argues that he did not initially provoke the use of force against himself, and that, in any event, he did not do so with the intent to use that force as an excuse to inflict bodily harm on Price. Defendant argues that Price was the initial aggressor and that defendant's only intent was to have Price leave his home. The trial court found that defendant's brandishing of the gun might be viewed by the jury as the initial act of aggression provoking the use of force by Price.

■ Both the State and the defendant are entitled to have the

jury instructed on their theories of the case, and an instruction is warranted if there is any evidence, no matter how slight, to support it. (*People v. Williams* (1983), 115 Ill. App. 3d 276, 279, 450 N.E.2d 851, 854.) Instructions concerning an aggressor's justifiable use of force may be given if the State presents evidence that the defendant was the aggressor, or even if there is a question as to whether defendant was the initial aggressor. *People v. Santiago* (1987), 161 Ill. App. 3d 634, 641, 515 N.E.2d 228, 233-34.

■ In the instant case, there was evidence that defendant pointed a loaded pistol at the victim while the victim was sitting on defendant's couch. Up to that point in time, Price had not been arguing with defendant, had not threatened defendant in any way and had not used force against defendant. We think this evidence at least raised the question of whether defendant was the initial aggressor and justified the giving of State's instructions numbers 12 and 13.

Defendant argues, however, that he never used force against Price and that simply pointing a loaded gun at another is not sufficient to qualify defendant as the initial aggressor. It has been held that mere words may be enough to qualify one as an initial aggressor. (*People v. Greschia* (1870), 53 Ill. 295; *People v. Tucker* (1988), 176 Ill. App. 3d 209, 217, 530 N.E.2d 1079, 1084.) In *People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 1112, 405 N.E.2d 1295, 1303, we held that the act of brandishing a knife at another might constitute an assault sufficient to justify giving the instructions. In *People v. Ellis* (1982), 107 Ill. App. 3d 603, 614, 437 N.E.2d 409, 418, we held that a jury might conclude that the defendant's act of obtaining a loaded revolver and shooting into a wall to scare the victim provoked the victim to the use of force, thus justifying the giving of the instructions.

The question of whether the use of deadly force was justified is for the jury. (*Slaughter*, 84 Ill. App. 3d at 1109, 405 N.E.2d at 1301.) We believe that evidence of defendant's act of pointing a loaded gun at Price was sufficient to at least allow the question of who was the initial aggressor to go to the jury for resolution.

In *Ellis*, we pointed out that the giving of the instructions complained of here does not erroneously assume that the defendant was the initial aggressor and where, as here, they are given with an additional instruction concerning when a person is justified in the use of force to defend himself, the jury is able to resolve the issues on either hypothesis. (*Ellis,* 107 Ill. App. 3d at 614, 437 N.E.2d at 418.) We believe that the State in the instant case was entitled to have the jury instructed on its theory that, because defendant was the initial aggressor, his right to use force in self-defense was limited. Further-

more, because the jury was instructed also on defendant's theory of self-defense, it was able to choose between the conflicting theories and resolve the issue of who was the initial aggressor on either hypothesis.

■ Defendant also argues that, even if there was sufficient evidence that he was the initial aggressor to warrant the giving of State's instruction number 12 on an initial aggressor's use of force, there was no evidence that defendant provoked the use of force against himself with the intent to use it as an excuse to harm Price. Thus, he argues, the trial court erred in giving State's instruction number 13 on provocation of first force as excuse of retaliation. Again, we disagree.

The evidence showed that defendant readied his handgun before Price returned to defendant's home and refused to leave. Defendant allowed Price to remain in his home 30 to 40 minutes before asking him to leave. There was testimony that defendant told a police officer that he shot Price because he was tired of him arguing. There was also evidence that defendant knew of Price's reputation for violence. We think this evidence is sufficient to raise the question of whether defendant provoked the use of force against himself with the intent to use that force as an excuse to inflict harm upon Price. The trial court did not err in allowing the jury to be instructed on the State's theory that defendant brandished the weapon at Price in order to provoke him into the use of force, so that defendant could then retaliate with deadly force.

Defendant's next argument is that the trial court erred in refusing his tendered jury instruction on the right to use force in defense of dwelling. Defendant argues that this instruction should have been given because it is meant to cover not only the situation where one is attempting to protect one's dwelling, but also the situation where the defendant, within the confines of his dwelling, is protecting himself or others. Defendant argues that Price's entry into defendant's home was unlawful because he entered without permission and refused to leave when asked. Moreover, Price threatened to attack defendant by walking towards defendant. The State argues that Price lawfully entered defendant's home and sat and watched television with defendant for 30 to 40 minutes before defendant asked him to leave. Therefore, the State argues, the defense of defense of dwelling was not available to defendant and the trial court properly refused the instruction.

■ While very slight evidence upon a given theory justifies giving an instruction, the "very slight evidence" test does establish a

minimum standard to be met before instructions are required. (*People v. Ishmael* (1984), 126 Ill. App. 3d 320, 326, 466 N.E.2d 1334, 1339.) In the instant case, we think the trial court properly found that there was no evidence to support defendant's theory that he acted in defense of his dwelling. Therefore, the trial court properly refused the instruction.

■■ ■ A person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes the conduct is necessary to prevent or terminate another's unlawful entry into or attack upon a dwelling, and (1) the entry is made or attempted in a violent, riotous or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling, or (2) he reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling. (Ill. Rev. Stat. 1989, ch. 38, par. 7—2.) We find in the instant case that the defense of defense of dwelling was not available to defendant because Price's entry to defendant's home was not unlawful as required by the statute.

While defendant testified that he did not invite Price and Moore into his home, and that they did not ask permission to enter, he did not object when they entered and allowed them to remain for 30 to 40 minutes watching television before he asked them to leave. The evidence further indicates that defendant and Moore had been friends and had, in fact, lived together in defendant's home for a period of time. Defendant had seen Moore and Price at his home shortly before they returned and entered and did not tell them they were not welcome in his home. In fact, the evidence indicates that defendant fully expected them to return and prepared for their return by loading his handgun. There is no evidence that Price's entry into defendant's home was unlawful.

In *People v. Chapman* (1977), 49 Ill. App. 3d 553, 364 N.E.2d 577, we held that a defendant could not assert the defense of defense of dwelling where she shot her live-in boyfriend while he was beating her. The defendant argued that she acted to prevent the commission of a forcible felony, aggravated battery, in her home. We held that the defense was not applicable because the victim, who shared the apartment with the defendant, was not an intruder.

In *People v. Brown* (1974), 19 Ill. App. 3d 757, 312 N.E.2d 789, we held that the defense of defense of dwelling is not available where the victim lawfully entered the dwelling by invitation of one of the residents. Similarly, in *People v. Miles* (1989), 188 Ill. App. 3d 471,

544 N.E.2d 986, we held that the defense was not available where the victim entered the home without invitation or permission, but was welcomed, because the entry was not unlawful.

Finally, in *People v. Ellis* (1982), 107 Ill. App. 3d 603, 613, 437 N.E.2d 409, 417, we held that, in order to justify the use of force in defense of dwelling, the entry into the dwelling must be unlawful or there must be an attack upon the dwelling. In that case, we declined to hold that a defense-of-dwelling instruction should be given if the entry was lawful but the rightful occupant used force to attempt to evict one who refused to leave.

In *Ellis*, the defendant and victim had been living together temporarily. On the night of the offense, defendant had asked the victim to move out of the apartment and the victim had refused. A fight ensued, during which the defendant shot and killed the victim. At trial, the court refused defendant's tendered instruction relating to the defense of defense of dwelling. We affirmed, holding that the uncontroverted evidence established that the victim's entry into defendant's apartment was lawful and therefore the defense of defense of dwelling was unavailable and the instruction was properly refused.

We find the instant case to be similar to *Ellis* and therefore hold that the trial court did not err in refusing defendant's tendered jury instruction on the right to use force in defense of dwelling.

For the foregoing reasons the judgment of the circuit court of Saline County is affirmed.

Affirmed.

RARICK, P.J., and GOLDENHERSH, J., concur.