# Illinois Official Reports

## Appellate Court

---

### *In re D.Q.*, 2016 IL App (1st) 160680

---

| | |
|---|---|
| Appellate Court Caption | *In re* D.Q. and J.C., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Sabrina V., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-0680 |
| Filed | November 4, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-JA-599-600; the Hon. Rena M. Van Tine, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy L. Campanelli, Public Defender, of Chicago (Trenis Jackson, Assistant Public Defender, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.<br><br>Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Allison G. Castillo, of counsel), guardian *ad litem*. |

| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1     The instant appeal arises from the juvenile court's entry of an adjudication order finding three-year-old D.Q. and one-year-old J.C. abused and neglected due to (1) an injurious environment and (2) substantial risk of physical injury, and making them wards of the court. Respondent Sabrina V., the children's mother, argues that the primary evidence against her consisted of a video in which she is shown repeatedly striking D.Q. with a stick, which was improperly admitted into evidence and, accordingly, there was no evidence to support the juvenile court's findings. For the reasons that follow, we affirm.

¶ 2                                          BACKGROUND

¶ 3     On June 15, 2015, the State filed two petitions for adjudication of wardship, requesting that D.Q. and J.C. be adjudicated wards of the court; the State also filed motions for temporary custody the same day. The adjudication petition relating to D.Q. claimed that D.Q. was a female minor born on March 13, 2012, and was neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2014)) in that "she [was] a minor under 18 years of age whose environment [was] injurious to her welfare." The adjudication petition also claimed that D.Q. was abused under section 2-3(2)(i) of the Juvenile Court Act (705 ILCS 405/2-3(2)(i) (West 2014)) in that her parent "[i]nflicts, caused to be inflicted, or allows to be inflicted upon [her] physical injury, by other than accidental means, which caused death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function" and further claimed that D.Q. was abused under section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2014)) in that her parent "[c]reates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function."

¶ 4     The facts in the petition underlying all three claims set forth above were the same. According to the petition, on May 24, 2015, a video of respondent repeatedly hitting D.Q. with a spatula and stick was turned over to "police personnel."[1] In the video, respondent was observed striking D.Q. on various parts of her body while dragging her across the floor. Additionally, respondent and D.Q.'s father[2] had a history of domestic violence with each other in D.Q.'s presence. According to the petition, there was a no contact order between respondent and D.Q. and an order of protection which prohibited the father from having contact with D.Q.

_____

[1]Testimony at the adjudication hearing establishes that the video was taken to the River Grove police department.

[2]The petition for adjudication of wardship named Christopher Q., D.Q.'s father, in addition to respondent. However, Christopher Q. is not a party to the instant appeal. Accordingly, we relate facts concerning him only where necessary to the understanding of respondent's appeal.

¶ 5 The adjudication petition relating to J.C. was similar, claiming that J.C. was a male minor born on January 26, 2015, and was neglected under section 2-3(1)(b) of the Juvenile Court Act in that "he [was] a minor under 18 years of age whose environment [was] injurious to his welfare." The adjudication petition also claimed that J.C. was abused under section 2-3(2)(ii) of the Juvenile Court Act in that his parent "[c]reates a substantial risk of physical injury to the minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." The underlying facts of J.C.'s claims were identical to those alleged in D.Q.'s petition.[3] J.C.'s petition also alleged that his putative father[4] was currently incarcerated and that paternity had not been established.

¶ 6 After a temporary custody hearing on June 16, 2015, at which the parties stipulated to the facts alleged in the State's petitions for adjudication of wardship, the juvenile court found probable cause that both children were abused and/or neglected and that an immediate and urgent necessity existed to support their removal from the home. The court granted temporary custody of both children to the Department of Children and Family Services (DCFS) guardianship administrator, with the right to place the children and with the authority to consent to major medical care on their behalf.

¶ 7 On November 9, 2015, the State filed a motion to continue the trial date due to the State's "ongoing efforts to obtain evidence and information that would allow the People to locate the source of the video referenced in the petition," including outstanding subpoenas for telephone subscriber information, metadata analysis of the video files, and a new individual with possible knowledge of the video source. On November 10, 2015, the juvenile court took the motion under advisement, and the parties proceeded with an adjudication hearing.

¶ 8 The State's first witness was Christopher Q., D.Q.'s father, who testified that the DVD marked as People's Exhibit 1 contained "a video of [respondent] abusing my daughter [D.Q.]" Christopher Q. testified that he was able to identify the woman in the video as respondent, based on "[h]er body type, her voice, height, just[—]it's her." He further testified that he recognized D.Q. in the video based on "her physical appearance, her—her size, her voice, the sound of—the sound of her cheeks. It's my daughter. I know my daughter." He testified that he had observed both respondent and D.Q. numerous times in the past and had known respondent since 2011. Christopher Q. testified that there was no doubt in his mind as to who was on the video "[b]ecause *** I'm absolutely familiar with their appearance and how they sound and *** how they look."

¶ 9 Christopher Q. testified that he became aware of the video when he received it on his cell phone from respondent's mother. After viewing the video, he brought it to the River Grove police department. Christopher Q. was not present when the video was made and did not know

---

[3]Under the Juvenile Court Act, proof of the abuse or neglect of one minor is admissible evidence of the abuse or neglect of any other minor for whom the respondent is responsible. 705 ILCS 405/2-18(3) (West 2014). Thus, the allegations of abuse and neglect with respect to J.C. were based on the facts underlying the allegations of abuse and neglect as to D.Q.

[4]The petition for adjudication of wardship named Elvin C., J.C.'s putative father, in addition to respondent. However, Elvin C. is not a party to the instant appeal. Accordingly, as is the case with D.Q.'s father, we relate facts concerning him only where necessary to the understanding of respondent's appeal.

when it was taken or who recorded it. He testified that the video he received on his cell phone and the video he reviewed in court were "the same exact video."

¶ 10    The State next called respondent as a witness, but respondent refused to testify and asserted her fifth amendment privilege against self-incrimination with respect to all questions concerning the case; respondent only answered questions identifying herself as the mother of D.Q. and J.C.

¶ 11    The State's next witness was Alicia Pickett, a child protection investigator with DCFS, who testified that she was assigned to the children's case in May 2015 and met with D.Q. on May 27, 2015, at approximately 4 p.m. at her maternal grandmother's place of employment. While D.Q.'s grandmother was present in the vicinity, she was not present during the conversation that Pickett had with D.Q. Pickett testified that she asked D.Q. her name and age, and D.Q. responded with her name and that she was three years old, and then showed Pickett a tea set she had received; Pickett described D.Q. as a "happy, happy kid." Pickett asked D.Q. what happened when she did not listen to her mother, and D.Q. responded "that Mom had hit her in the face." Pickett asked D.Q. what respondent had hit her with, and D.Q. responded "a stick." Pickett asked D.Q. why respondent had hit her with a stick, and D.Q. responded that it was because D.Q. was crying. Pickett did not observe any marks or bruises on D.Q. at the time. On cross-examination, Pickett testified that she did not know what day or time D.Q.'s statements referred to or any of the context surrounding what happened.

¶ 12    Pickett testified that she also had a conversation with respondent on May 27, 2015, at approximately 4:30 p.m. at her mother's place of employment, the same location at which Pickett had spoken with D.Q. Respondent and Pickett were the only ones present for the conversation. Pickett read respondent the CANTS report,[5] and respondent denied hitting D.Q. with a spatula. Respondent told Pickett that she "never knew about this videotape and that she hired an attorney to see what's going on at the River Grove Police Department." Respondent told Pickett that in the past, she had suffered from postpartum depression and "may have tapped [D.Q.] on the hand" when disciplining her.

¶ 13    After Pickett's testimony, the State renewed its motion for a continuance for the purpose of further searching for the source of the video, but the motion was denied. The State then called its next witness, Ida Lane, a DCFS investigator assigned to the children's case. Lane testified that in May or June 2015, she viewed the video and identified D.Q. as the child on the video and respondent as the woman depicted in the video. Lane testified that, on the video, she observed D.Q. being struck with a round stick-like object and then later hit with a spoon or spatula. She also heard D.Q. saying "Stop mommy" on the video. Lane testified that she used the video's contents as a basis for the indicated finding of abuse and found the video to be very concerning "[b]ecause [of] the baby's pleas and the way she was crying, the way she was being grabbed by Mom." Lane further explained that "[s]he was crying really loudly, and [respondent] walked into a room, told her to stay in the corner. The baby came out, proceeded in the room. She came back out, grabbed her by her arm and was hitting her again with that spoon, that spatula or whatever."

---

[5]According to the public guardian's brief, a CANTS report "is a child abuse and neglect tracking report. The initial CANTS form is a notification of a report of suspected child abuse/neglect, and it explains DCFS's child abuse/neglect investigation process."

¶ 14 Lane testified that she spoke with Christopher Q. over the telephone on June 10, 2015, at approximately 10 a.m. concerning the video. Christopher Q. informed Lane that he had received the video from respondent's mother and took it to the police. Christopher Q. further informed Lane that respondent and D.Q. were depicted on the video and that D.Q. was living with respondent at that time.

¶ 15 Lane also testified that she spoke with respondent on June 12, 2015, in an empty juvenile court courtroom. Lane asked respondent who took the video, and respondent "said that [it was] someone who she thought was her friend." Lane asked respondent the person's name, but respondent refused to identify the person who took the video. Respondent also told Lane that the video was taken in April 2015 at the apartment in which she was then living with her two children. Lane asked respondent "[w]hy did she hit the baby like that," but respondent did not answer. On cross-examination, Lane testified that during her conversation with respondent, respondent denied hitting D.Q.

¶ 16 On cross-examination and redirect examination, Lane testified as to the contents of records that she reviewed in the course of her investigation. On cross-examination, Lane testified that D.Q. denied any abuse by respondent when she was evaluated at a hospital on May 27, 2015. On redirect examination, Lane testified that her review of medical records during the course of her investigation indicated that during a victim sensitive interview conducted with D.Q., D.Q. stated that respondent hit her with a stick on her leg and that, as a result of that, "[t]he cop took mommy." In that same statement, D.Q. stated that respondent hit her "[l]ots of times" and that there was a yellow mark on her leg; she stated that the conduct occurred at respondent's home.

¶ 17 The State then called as a witness Maxine Morgan, a child development aid with DCFS, who testified that she spoke with D.Q. at Morgan's place of employment on June 10, 2015, and heard her use a curse word, which she "wasn't expecting a three-year old to say." D.Q. also told Morgan that "Elvie" "hit [her] in the stomach" and pulled a gun. Morgan forwarded this conversation to Lane and Lane's supervisor. On cross-examination, Morgan testified that she did not ask D.Q. who "Elvie" was or when this incident occurred. She further testified that her responsibilities as a child development aid were to assist the caseworker when children were in the office and take possession of the children until they were ready to leave; she also transported them to the hospital for an initial health screening and then to their placement. Morgan was not aware of the reason the case came into the system at the time that the children came to the office.

¶ 18 After Morgan's testimony, the State offered the video into evidence. Respondent's attorney objected due to lack of a foundation, and the juvenile court overruled the objection and admitted the video into evidence.

¶ 19 The video depicts a woman and a small girl who is crying. The woman follows the girl into what appears to be a bathroom, where the girl crouches down, away from the woman. The woman, holding what appears to be a wooden spatula or spoon in her hand, uses the object to strike the girl's body several times. The woman then drags the girl into the hallway, where she stands the girl in the corner, near the doorway of another room. The girl leaves the corner, but the woman pulls her back. While the girl stands in the corner, the woman goes into the next room, then returns shortly thereafter, holding a different object in her hand. The woman again grabs the girl, then hits the girl with the object. The girl is crying throughout, and it appears that dialogue is spoken, but this court's video equipment was unable to play the audio of the video.

¶ 20    On November 10, 2015, the juvenile court found that the State had satisfied its burden of proof in showing that both children were abused and neglected and that the conduct toward them constituted neglect due to an injurious environment and abuse due to a substantial risk of physical injury. The court also found that, with respect to D.Q., the State had satisfied its burden of proof as to physical abuse and that respondent inflicted upon D.Q. physical injury, which would be likely to cause impairment of emotional health, "at the very minimum." Furthermore, in light of the video, the court found that it was "going to amend the petition to conform with the proofs and also find that the State has proved an excessive corporal punishment count as well as to [D.Q.]"[6] The juvenile court further found that there was no indication that the video had been edited or spliced, and no evidence suggesting that such actions had occurred. Accordingly, the juvenile court entered an adjudication order finding D.Q. to be abused or neglected due to (1) an injurious environment, (2) physical abuse, (3) substantial risk of physical injury, and (4) excessive corporal punishment. The court also entered an adjudication order finding J.C. abused or neglected due to (1) an injurious environment and (2) substantial risk of physical injury. In both orders, the court found that the above was the result of abuse or neglect inflicted by respondent.

¶ 21    On February 8, 2016, the juvenile court entered a dispositional order finding it in D.Q.'s best interest to be adjudged a ward of the court and finding both respondent and D.Q.'s father unable for some reason other than financial circumstances alone to care for, protect, train, or discipline her. The court ordered D.Q. placed in the custody of the DCFS guardianship administrator with the right to place her. The court entered an identical dispositional order with respect to J.C. and his parents. The court also entered a permanency order setting an initial permanency goal of return home within five months. This appeal follows.

¶ 22                                    ANALYSIS

¶ 23    On appeal, the sole issue raised by respondent concerns the admission of the video into evidence. Respondent claims that the juvenile court erred in admitting the video into evidence due to a lack of foundation, and since the court's findings relied on the video, respondent argues that the court's findings that the children had been abused and neglected were against the manifest weight of the evidence.

¶ 24    "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). It is the State's burden to prove allegations of neglect or abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. "In other words, the State must establish that the allegations of neglect [or abuse] are more probably true than not." *In re A.P.*, 2012 IL 113875, ¶ 17. With respect to the admission of evidence, we must determine whether the juvenile court abused its discretion

---

[6]Under the Juvenile Court Act, the juvenile court "may allow amendment of the petition to conform with the evidence at any time prior to ruling." 705 ILCS 405/2-13(5) (West 2014). We thus interpret the juvenile court's statement to mean that it was permitting the State to amend the petition in accordance with section 2-13(5). We note that respondent did not object to a finding of abuse on this basis before the juvenile court and does not make any argument on appeal concerning the juvenile court's authority to enter the finding, other than the argument concerning the admission of the video, which is applicable to all counts of the petition.

in admitting the video into evidence, and we will not reverse the juvenile court's admission of evidence absent an abuse of its discretion. *In re A.W.*, 231 Ill. 2d 241, 254 (2008). " 'Under this standard, an abuse occurs when the [juvenile] court's ruling is fanciful, unreasonable or when no reasonable person would adopt the [juvenile] court's view.' " *In re D.M.*, 2016 IL App (1st) 152608, ¶ 15 (quoting *People v. Taylor*, 2011 IL 110067, ¶ 27).

¶ 25   In the case at bar, the evidence at issue is a video that allegedly shows respondent repeatedly striking D.Q. with several objects. Our supreme court has found that "videotapes are admissible on the same basis as photographs," and they "may be admitted if properly authenticated, which is an evidentiary question" (*Taylor*, 2011 IL 110067, ¶ 27). Our supreme court explained that while photographic evidence was historically admitted solely as demonstrative evidence, "[m]ost jurisdictions now allow photographs and videotapes to be introduced as substantive evidence so long as a proper foundation is laid." *Taylor*, 2011 IL 110067, ¶ 32. A proper foundation may be laid "by someone having personal knowledge of the filmed object, [who can testify] that the film is an accurate portrayal of what it purports to show." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283-84 (2003). Additionally, video evidence may be admitted under the "silent witness" theory, under which "a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation." *Taylor*, 2011 IL 110067, ¶ 32. In the case at bar, we cannot find that the juvenile court abused its discretion in admitting the video under either basis.

¶ 26   First, after viewing the video, Christopher Q., D.Q.'s father, positively identified both respondent and D.Q. as the woman and child in the video, as did Ida Lane, the DCFS investigator assigned to the children's case. Thus, although they did not observe the incident depicted on the video, two people with personal knowledge of both respondent and D.Q. testified that the video was an accurate portrayal of the two individuals depicted on the video. Additionally, Lane testified that she spoke with respondent on June 12, 2015, in an empty juvenile court courtroom, where respondent informed Lane that the incident had occurred in April 2015. Lane further testified that respondent identified the location of the video as her former apartment and told Lane that the video was taken by "someone who [respondent] thought was her friend." Thus, through Lane's testimony, respondent admitted to having personal knowledge of the incident depicted in the video and to being present at the time that the video was taken.[7] In addition, D.Q. told Pickett that her mother struck her with a stick.

---

[7]The State and the public guardian also argue that respondent's invocation of the fifth amendment privilege during her testimony permit us to treat respondent's answers as admissions to the questions asked. See *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 332 (1997). However, "although a court may draw a negative inference from a party's refusal to testify, it is not required to do so." *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 107. In the case at bar, the juvenile court's admission of the video into evidence was proper, regardless of whether a negative inference would have been appropriate, and we consequently have no need to decide the issue. We further note that there was no objection during the hearing concerning the admissibility of respondent's statements during the conversation with Lane other than a relevance objection, and respondent makes no argument concerning the admissibility of her statements on appeal.

Consequently, the juvenile court did not abuse its discretion in its determination that the State had presented an adequate foundation for admission of the video.

¶ 27 Furthermore, even under the "silent witness" theory, under which "a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation" (*Taylor*, 2011 IL 110067, ¶ 32), we cannot find that the juvenile court's admission of the video constituted an abuse of discretion. Our supreme court has instructed that factors that may be considered when determining the reliability of the process by which a videotape was produced include (1) the device's capability for recording and its general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process. *Taylor*, 2011 IL 110067, ¶ 35. Our supreme court has "emphasize[d] that this list of factors is nonexclusive. Each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Taylor*, 2011 IL 110067, ¶ 35.

¶ 28 Here, as noted, after viewing the video, Christopher Q. positively identified both respondent and D.Q. as the woman and child in the video, as did Lane. Thus, the camera used to record the video was clearly operational at the time and was able to record sufficiently clearly so that the individuals in the video were identifiable, as were their actions. Our supreme court has found that such evidence is sufficient to adequately demonstrate that the camera was able to record and was generally operating properly. See *Taylor*, 2011 IL 110067, ¶ 39 ("As one court has stated, '[t]he fact that the tape[ ] exist[s] at all is evidence that the tape recorder was functional and that [the operator] knew how to operate it.' [Citation.] Moreover, 'the evidence showed that the camera was working at least well enough for the events and persons portrayed thereon to be recognizable.' [Citation.] *** The State adequately demonstrated the camera and system were able to record and were generally operating properly."). Christopher Q. also testified that he received the video from respondent's mother and that, after viewing the video, he took it to the River Grove police department. He further testified that the video he received on his cell phone and the video played in court were "the exact same video." Thus, Christopher Q.'s testimony verified that the same video he received was played in court, demonstrating the authenticity of the recording. Finally, the juvenile court found that there was no evidence that the video had been altered or tampered with such that it would be rendered unreliable or untrustworthy. Consequently, we cannot find that the juvenile court abused its discretion in admitting the video into evidence. Since there was no error in the admission of the evidence, we do not find respondent's argument that the admission of the video rendered the juvenile court's findings against the manifest weight of the evidence and, accordingly, affirm the juvenile court's adjudication findings.

¶ 29                                                   CONCLUSION

¶ 30 For the reasons set forth above, the juvenile court did not abuse its discretion in admitting the video of respondent striking her daughter into evidence. Therefore, the juvenile court's adjudication findings are affirmed.

¶ 31        Affirmed.