**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220368-U

Order filed August 16, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0368 Circuit No. 18-CF-2213 |
| DONALD R. PELKA, | ) ) ) | Honorable Ann Celine O'Hallaren Walsh, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Holdridge and Hettel concurred in the judgment.
_____

**ORDER**

¶ 1      *Held*:   Defendant is not entitled to a new trial due to cumulative error.

¶ 2      Defendant, Donald R. Pelka, appeals his conviction of first degree murder, arguing the cumulative effect of three errors deprived him of his right to a fair trial. Specifically, defendant alleges (1) the State failed to lay a proper foundation for security footage, (2) the Du Page County circuit court erred in granting the State's motion *in limine* precluding evidence of a

psychostimulant drug in the victim's backpack, and (3) the court erred in giving the initial aggressor jury instruction. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4         Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) for allegedly shooting and killing Kyle Gojdas outside the Bella One Spa, an adult entertainment establishment. Prior to trial, defendant filed a motion *in limine* to preclude the admission of surveillance videos from the spa, arguing they could not properly be authenticated. Defendant further contended the videos contained gaps in time, skipped, and there were apparent alterations to material parts rendering the footage unreliable. The State argued that even if portions of the videos were inaudible, that did not render the evidence inadmissible. The State further asserted the video could be authenticated through both occurrence witnesses and the silent witness theory. The court denied the motion and ruled that any defects in the videos went to its weight and not its admissibility, noting the State would still have to lay a proper foundation at trial.

¶ 5         The State filed a motion *in limine* seeking to bar evidence that a bottle labeled "bromantane" and a dropper were found in Gojdas's backpack located in the spa's office. Bromantane is a psychostimulant, and the defense intended to argue it could cause aggression. The State believed this evidence should be barred because there was no testing done on the contents of the bottle, the autopsy did not reveal any drugs in Gojdas's system, and there was no other evidence indicating Gojdas took the drug on the date in question. Defendant argued it was a reasonable inference that the bottle contained what was on the label and the autopsy did not specifically test for bromantane. The court granted the State's motion, believing the jury could be misled by the evidence.

¶ 6    The case proceeded to trial on June 7, 2022. Du Page County Sheriff's Detective Millenium Wheeler testified that on September 28, 2018, she was dispatched to the spa in response to a shooting. Gojdas was lying on the ground in the parking lot. He was dead when Wheeler arrived. There were two discharged Smith and Wesson .40-caliber cartridge casings near Gojdas's body. In the spa's office, Wheeler found receipts dated September 28, 2018, from 1:39 a.m., and shortly after 2 a.m., with defendant's name on them. Wheeler found a backpack with Gojdas's belongings, which the State had Wheeler open on the stand. Defense counsel asked for a sidebar and stated that the State had opened the door for the admission of the bromantane by having Wheeler open the backpack. The court ruled the bromantane was still inadmissible.

¶ 7    Du Page County Sheriff's Detective Rob Dubeck testified that he was the "point person and general detective for video evidence," during this investigation and had worked on hundreds of cases involving video surveillance.Dubeck testified that after he arrived at the spa, he located the surveillance system which utilized eight cameras, four inside and four outside. Only the internal cameras captured audio. At the spa, Dubeck viewed the footage on the spa's digital video recording (DVR) system. An interior camera captured audio of a conversation followed by a gunshot that occurred outside the spa. An external camera partially captured the encounter between defendant and Gojdas. After reviewing the footage, Dubeck obtained a search warrant for the spa's DVR system. At the sheriff's office, using the DVR's own software to export the files, Dubeck copied the pertinent parts of the video to a thumb drive. The thumb drive contents were then copied onto a Blu-ray disc, initialed by Dubeck. Dubeck explained that this was the procedure employed for most cases where video evidence is obtained from a DVR system. Dubeck then compared the copy he created to the original video by watching them

3

simultaneously on two different screens. Dubeck testified that the copy was a true and accurate copy of the audio and video on the DVR system as to all eight camera angles. Dubeck identified the Blu-ray disc he created and initialed. The State sought to admit the Blu-ray. Defendant objected, arguing a proper foundation had not been laid. The court overruled the objection.

¶ 8         Luis Early testified that he was a security guard at the spa in 2018. On September 28, 2018, at approximately 2 a.m., he went to the spa to pick up his wife, who was an employee at the spa. He saw his wife and another employee escorting defendant upstairs. Later, he heard defendant say, "this isn't working," and the women replied that he could return another day. Luis saw Gojdas arrive for his shift as a security guard at 2 a.m.

¶ 9         As Early was in the parking lot, defendant entered his truck, began to pull out of his parking space, then stopped to speak to Early. Defendant appeared agitated. Early testified that this interaction occurred near the spa's external stairs. Gojdas opened the spa door at the top of the external stairs and two women were with him. When defendant saw them, he took his foot off the brake and stated, "I'm going to ram this *** I'm going to take this fucker out *** they ripped me off." The State sought to admit another Blu-ray which showed defendant's truck moving forward toward the spa's external stairs and then backing up.

¶ 10         Karla Escamilla testified that she previously worked at the spa. When she arrived at the spa at approximately 2:05 a.m. on September 28, 2018, Gojdas and two other security guards were working. There were also two female employees upstairs with a customer. The customer, later identified as defendant, came downstairs with the two women so he could obtain more money from the automated teller machine (ATM). After they returned upstairs, defendant began arguing with the women. Defendant then exited the spa clearly aggravated. Escamilla testified that there was a commotion outside, and defendant was moving his truck back and forth close to

4

the spa's external stairs. Gojdas then went outside to confront defendant. Defendant was yelling at the spa's security guards. Escamilla recorded the confrontation which was admitted into evidence. On the recording, defendant is seen pointing his finger at Gojdas's chest and repeatedly saying, "I'll be back." Escamilla testified that defendant left after she stopped recording.

¶ 11     Approximately 20 to 30 minutes later, defendant returned in his truck. Escamilla told Gojdas to lock the doors, which he did. On the security camera, she saw defendant outside the spa saying he had left his glasses. She began recording on her cell phone again, which was admitted into evidence. The recording showed defendant at the top of the external stairs asking for his glasses. Escamilla found defendant's glasses and gave them to Gojdas. Defendant was at the bottom of the stairs when Gojdas exited the spa. From inside, Escamilla heard defendant and Gojdas talking but could not hear what they were saying. She then heard a gunshot and Gojdas screaming, followed by a second gunshot. Escamilla then heard defendant call Gojdas a "stupid mother-fucker" before entering his truck and leaving.

¶ 12     The State introduced a video recording with two security camera angles side-by-side. One side showed an internal room, and the other showed the spa's external staircase and parking lot. Each of the two camera angles was independently time stamped. Defendant reiterated his objection to the foundation for the video, which was overruled. The external side of the video showed defendant walking up the stairs and knocking on the door before asking for his glasses. Defendant and Gojdas spoke through the door before defendant went down the stairs. Defendant then came back up, knocked again, and yelled for his glasses. Gojdas then exited the spa and descended the stairs. Defendant said, "thank you." They are then heard having a discussion and the top of their heads are occasionally visible at the bottom of the screen. Eventually, a gunshot

5

is heard followed by screaming and a second gunshot. Defendant then said, "you jag-off. Fucking prick." Both of Gojdas's hands can be seen raised above his unseen head in between the gunshots. The parties stipulated that Gojdas's cause of death was two gunshot wounds to the chest.

¶ 13        Escamilla testified that she exited the spa after defendant's truck had left and found Gojdas lying at the bottom of the stairs. He was struggling to breathe, and his shirt was bloody. She never heard or saw Gojdas threaten defendant, did not see Gojdas possess a weapon, nor did she hear or see any spa employees threaten defendant that night.

¶ 14        Hanover Police Officer Joe Stranski testified that on September 28, 2018, shortly after 3:30 a.m., he was on patrol when he saw a truck travelling 31 miles per hour over the posted speed limit. He effectuated a traffic stop on the truck approximately a mile and a half from the spa. Defendant was the only individual in the truck. While Stranski was speaking to defendant, he received a call that there had been a shooting at the spa. Stranski observed the "color drain[ ] from [defendant's] face and he became very stoic and just kind of stared off." Based on defendant's reaction, Stranski returned to his squad car to collect more information. Stranski was informed the suspected vehicle was a silver truck, and he called for backup. After two additional officers arrived, defendant was instructed to exit the truck. Officers asked defendant if he had a weapon on his person or in the truck, and defendant stated there was a firearm in the truck. The squad car's dash camera footage corroborated Stranski's testimony and was admitted into evidence. A subsequent search of the truck uncovered a Smith and Wesson .40-caliber firearm in the console. Defendant's arm was tested for gunshot residue, which was positive, showing defendant either discharged a firearm or was near a discharged firearm.

¶ 15     The defense called four of defendant's friends to testify on his behalf. Three testified regarding defendant's peaceful nature. The fourth friend testified they were drinking and playing in a darts league the night of September 27, 2018. Defendant treated everyone well and was in a good mood. The defense also called two women who were working at the spa the night of the incident who testified that defendant's demeanor was, "very nice" and that he "seemed like a nice old guy."

¶ 16     Dr. James O'Donnell testified as an expert in the field of pharmacology. In his professional opinion, defendant was significantly impaired the night of the incident as he had consumed excessive amounts of prescription medications and alcohol. As a result, defendant would have, "misperceived *** the risk that he was involved in" during the incident. Outside the presence of the jury, defense counsel then presented an offer of proof. Counsel explained that O'Donnell would testify that bromantane was a psychostimulant not currently approved for use in humans and was associated with violence and aggression. The court accepted the offer of proof, but affirmed its previous ruling which barred any evidence related to Gojdas's possession of the drug.

¶ 17     Defendant testified that in September 2018, he was taking several prescription medications for pain and anxiety. Defendant went into detail regarding the medication that he took on September 27, 2018, before and during his darts league. The amount of each medication he took exceeded the recommended dosage. He also consumed approximately 11 alcoholic drinks during the darts league.

¶ 18     While driving home from the dart league, defendant stopped at the spa. He had never previously visited but believed it was a place of prostitution. His memory of his time at the spa was "sketchy, almost nonexistent." He remembered encountering Gojdas and described him as

7

"kind of a big guy, muscular." Gojdas informed defendant they did not give refunds. Defendant testified that their conversation changed Gojdas's demeanor, and he became very mad. Defendant continued to ask for a refund and said he was not going to leave. Gojdas told defendant to leave or he would be hurt. Defendant was frightened by Gojdas's threat and left. In the parking lot, defendant spoke to another individual and told them that he would return because the spa's employees had asked him to. Defendant stated he never threatened Gojdas or anyone else at the spa.

¶ 19        After defendant arrived home, he noticed he did not have his glasses. He decided to return to the spa to retrieve his glasses. Defendant brought his gun for self-defense because he was scared and intimidated in light of Gojdas's threat. Defendant testified that he only wanted his glasses, and he did not intend to kill anyone.

¶ 20        Upon arriving at the spa, defendant knocked on the door at the top of the external stairs, but no one answered. He descended the stairs and knocked on the wall. Gojdas then exited the spa and returned defendant's glasses. Defendant again asked for his money back. Gojdas immediately became upset, was gritting his teeth, and appeared mad and threatening. Gojdas told defendant that he had his glasses and should leave before he got hurt. Gojdas then reached his arm behind his back and defendant thought he was pulling out a gun to shoot him. Defendant then pulled out his gun and shot Gojdas from approximately four to six feet away. Gojdas was still "coming at" defendant, and defendant feared for his safety. Defendant fired a second shot. Defendant did not remember saying anything after shooting Gojdas and felt "delirious," "in shock," and "in horror." Defendant then drove away in his truck before being pulled over. He did not remember much of the traffic stop. He heard the officer's radio stating that Gojdas had been

shot and killed. He further testified that he was devastated to learn Gojdas had died and did not intend to kill anyone but believed it was his only option.

¶ 21   During the jury instruction conference, defense counsel objected to the initial aggressor instructions as proposed by the State. See Illinois Pattern Jury Instructions, Criminal, Nos. 24-25.09, 24-25.09X (4th ed. 2000) (hereinafter IPI Criminal 4th). The defense claimed that the question of who was the initial aggressor was not at issue, but, if the instructions were to be given, additional language regarding withdrawal should be included. The court decided to give the instructions as presented by the State. The jury was also given the self-defense jury instruction.

¶ 22   During closing arguments, the State argued defendant committed premeditated first degree murder in that he went home to retrieve his gun before returning to the spa and shooting Gojdas. The State also read the initial aggressor instruction (see IPI Criminal 4th No. 24-25.09) to the jury and argued that defendant was the only aggressor during the confrontation. Defense counsel argued that defendant was so severely intoxicated that he could not have formed the intent to commit first degree murder, and instead defendant lawfully defended himself.

¶ 23   The jury found defendant guilty of first degree murder. Defense counsel filed a motion for a new trial, arguing the foundation for the security footage was not properly laid, the court erred in barring evidence of the bromantane bottle in Gojdas's backpack, and the initial aggressor jury instructions should not have been given. The court denied the motion and sentenced defendant to 50 years' imprisonment. Defendant filed a motion to reconsider the sentence, which was denied.

¶ 24                                   II. ANALYSIS

¶ 25    On appeal, defendant argues he was denied his right to a fair trial due to the cumulative effect of three errors. Specifically, defendant argues (1) the State failed to lay a proper foundation for the security footage, (2) the circuit court erred in barring evidence that the victim was in possession of a psychostimulant drug, and (3) the court erred in giving the initial aggressor jury instructions as requested by the State. We note that defendant does not argue that any of these alleged errors require reversal on their own, but solely argues the effect of the alleged errors together require reversal.

¶ 26    Whether the cumulative effect of multiple errors deprived defendant of his due process right to a fair trial is a question of law that we review *de novo*. *People v. Radcliff*, 2011 IL App (1st) 091400, ¶ 22. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). "However, the cumulative errors that warrant such an extreme result must themselves be extreme." *People v. Desantiago*, 365 Ill. App. 3d 855, 871 (2006). "There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue." *People v. Green*, 2017 IL App (1st) 152513, ¶ 118. Under the cumulative error analysis, a new trial may be necessary even if the evidence of defendant's guilt is overwhelming because the errors create a "pervasive pattern of unfair prejudice to defendant's case." *People v. Blue*, 189 Ill. 2d 99, 139 (2000).

¶ 27                                  A. Security Footage

¶ 28    We review the circuit court's decision to admit video recordings for an abuse of discretion. *People v. Taylor*, 2011 IL 110067, ¶ 27. An abuse of discretion occurs when the circuit court's ruling is fanciful or no reasonable person would adopt the court's ruling. *Id.*

10

¶ 29       Foundation for a video recording may be laid either " 'by someone having personal knowledge of the filmed object, [who can testify] that the film is an accurate portrayal of what it purports to show,' " or under the silent witness theory. *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 25 (quoting *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283-84 (2003)). Under the silent witness theory "a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation." *Taylor*, 2011 IL 110067, ¶ 32.

¶ 30       Nonexhaustive factors a court may consider when determining the reliability of the process which produced the video include:

> "(1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process." *Id.* ¶ 35.

Some factors may not be relevant and must be evaluated on a case-by-case basis. *Id.* "The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.* Further, "most editing will not render evidence inadmissible but rather will go to the weight of that evidence." *Id.* ¶ 44. To determine whether an edited video is admissible, courts look to whether the edits affect the reliability or trustworthiness of the recording, or in other words, "the edits cannot show that the recording was tampered with or fabricated." *Id.*

¶ 31       Here, Dubeck testified precisely as to how he created the Blu-ray footage. Dubeck brought the DVR system to the police station after obtaining a warrant and exported the relevant footage to a thumb drive using the DVR system's software. After copying the footage from that

11

thumb drive to a Blu-ray, Dubeck compared the Blu-ray to the original footage to ensure its accuracy, initialed the Blu-ray disc, and placed it into evidence. Dubeck further testified as to the chain of custody of the DVR system and Blu-ray disc and his competency as an operator of the device—having worked on hundreds of cases involving surveillance footage. The State therefore laid sufficient foundation, and the tape was properly admitted under the silent witness theory.

¶ 32    In coming to this conclusion, we reject defendant's contention that the "side-by-side video was a manipulation of two separate and distinct internal and external videos." However, there is no indication of improper manipulation of the video. Dubreck explained exactly how he created the Blu-ray disk and stated that he compared it to the original footage to check its accuracy.

¶ 33                                B. Bromantane

¶ 34    Defendant next argues the court erred when it granted the State's motion *in limine* to bar evidence that Gojdas had a bottle labeled "bromantane" and a dropper in his backpack. A circuit court's ruling on a motion *in limine* regarding the introduction or exclusion of evidence is reviewed for an abuse of discretion. *People v. Richter*, 2012 IL App (4th) 101025, ¶ 97. "A trial court is charged with the responsibility of determining whether evidence is relevant and admissible." *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 41.

¶ 35    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). The party seeking the evidence's admission bears the burden of establishing its relevance. *People v. Torres*, 2012 IL 111302, ¶ 53. A court may bar evidence if it is "remote, uncertain or speculative." *People v. Morgan*, 197 Ill.

12

2d 404, 456 (2001). "Evidence is considered speculative if an insufficient nexus exists to connect the offered evidence to the crime." *Kraybill*, 2014 IL App (1st) 120232, ¶ 41.

¶ 36     Here, defendant sought to admit the bottle labeled bromantane and a dropper in Gojdas's backpack to support his argument that Gojdas was the initial aggressor and defendant acted in self-defense because he feared for his life. Besides the presence of the bottle and dropper in Gojdas's backpack, defendant presented an offer of proof during a sidebar that Dr. O'Donnell would testify bromantane was a psychostimulant currently not approved for human use and was associated with violence and aggression. However, the autopsy did not show the presence of any drugs in Gojdas's system, there was no testimony from any employees that he took bromantane at any point, and there was no expert opinion to a reasonable degree of medical probability that Gojdas consumed the bromantane on the night of the incident. It is therefore entirely uncertain and speculative whether Gojdas had bromantane in his system at the time of the incident and the court reasonably concluded the bottle and dropper were not relevant. Given this insufficient nexus connecting the bottle and dropper to a fact of consequence, we do not believe the court abused its discretion in granting the State's motion *in limine*.

¶ 37                    C. Initial Aggressor Jury Instruction

¶ 38     Defendant next argues the court erred by providing the initial aggressor jury instructions because there was no evidence presented that warranted them. The court's decision to give a particular jury instruction is reviewed for an abuse of discretion. *People v. Dorn*, 378 Ill. App. 3d 693, 698 (2008). "The State and the defendant are both entitled to have the jury instructed on their theories of the case, and an instruction is warranted if there is even slight evidence to support it." *People v. Heaton*, 256 Ill. App. 3d 251, 257 (1994). The court errs if it submits an instruction when there is no supporting evidence. *Id.*

13

¶ 39   The initial aggressor jury instruction states:

> "A person who initially provokes the use of force against himself is justified in the use of force only if *** the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal No. 24-25.09.

In other words, "[a] nonaggressor has no duty to retreat, but he does have a duty not to become the aggressor." *In re D.N.*, 178 Ill. App. 3d 470, 475 (1988). "An initial-aggressor instruction is warranted when either the State presents evidence that defendant was the aggressor or the case involves a question of whether defendant was an aggressor." *People v. Brown*, 406 Ill. App. 3d 1068, 1079 (2011). Providing the jury with an initial aggressor instruction does not assume defendant was the initial aggressor where the jury is also provided with instructions concerning when a person is justified to use force to defend himself. *People v. Barnard*, 208 Ill. App. 3d 342, 350 (1991). "[M]ere words may be enough to qualify one as the initial aggressor." *Id.*

¶ 40   Here, there was evidence to support submission of the initial aggressor jury instructions. Defendant threatened to "ram" his truck into the spa, stating, "I'm going to take this fucker out." Defendant then exited his truck and repeatedly threatened Gojdas saying "I'll be back," while pointing at his chest as seen on the cell phone footage taken by Escamilla. Later, defendant returned with a loaded gun demanding his glasses back. Even if defendant was not the initial aggressor, he had the duty to exhaust every reasonable means to escape the danger. Moreover, the question of self-defense and whether defendant was the initial aggressor is a question of fact for the jury to resolve. *Heaton*, 256 Ill. App. 3d at 257. "Where there is conflicting evidence

14

regarding the issue of self-defense, the jury should be given both the self-defense and the initial aggressor instruction so that they might decide between the conflicting evidence and apply the correct law." *People v. Fleming*, 155 Ill. App. 3d 29, 37 (1987). The jury was given both the initial aggressor and the self-defense instruction and was, thus, able to make this determination for themselves. Finding no errors, we thus find no cumulative error. See *Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 41                                          III. CONCLUSION

¶ 42          The judgment of the circuit court of Du Page County is affirmed.

¶ 43          Affirmed.