2024 IL App (1st) 221864-U
No. 1-22-1864
Order filed December 20, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 03839 01 |
| | ) | |
| PAUL ZALEWSKI | ) | The Honorable |
| | ) | Joseph Cataldo, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices C.A. Walker and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Evidence was sufficient to convict defendant of first-degree murder. The trial court did not err by denying the defendant's motion to suppress the search warrant for his home or allowing in-court narration of surveillance video footage or then admitting it. Also, counsel did not provide him with ineffective assistance.

¶ 2    A jury found Paul Zalewski guilty of first degree murder, concealment of a homicidal death, and possession of a controlled substance. On appeal, Zalewski argues that (i) evidence obtained through a search warrant was inadmissible; (ii) the evidence was insufficient for a murder conviction; (iii) the trial court improperly allowed a detective to testify about surveillance videos;

(iv) the trial court wrongly admitted the surveillance videos; and (v) his counsel provided ineffective assistance.

¶ 3    We affirm, as the State presented overwhelming evidence against Zalewski, and he has not demonstrated any errors that affected the outcome of the trial.

¶ 4                                Background

¶ 5    Zalewski was accused of fatally shooting Vladimir Esquivel in Esquivel's Jeep, then moving both the Jeep with Esquivel's body to a nearby apartment complex and setting them on fire. No physical evidence tied Zalewski to the murder. Instead, the State relied on circumstantial evidence, including (i) ballistics, forensics, and narcotics, (ii) witness accounts, (iii) surveillance videos of Zalewski's movements, and (iv) data from Zalewski's and Esquivel's cell phones.

¶ 6                              *The State's Case*

¶ 7    At the jury trial, the State presented testimony that officers responded to a burning Jeep Wrangler around midnight at an apartment complex and found a body, later determined to be Esquivel's, in the front passenger seat. A strong scent of gasoline surrounded the Jeep.

¶ 8    An autopsy revealed Esquivel died from gunshot wounds incurred before the fire. There were seven wounds: one to the head, two to the right abdomen, one to the right upper arm, one to the right forearm, and one on the left ring finger. Gunshot residue suggested a firing distance of about one foot. The direction of the wounds indicated that the shots came from Esquivel's right. Police recovered two 9mm shell casings inside the Jeep.

¶ 9    Esquivel's girlfriend testified that the Jeep belonged to Esquivel and that he had left their apartment between 9:00 and 9:30 p.m. that night. Surveillance footage from their living room

showed Esquivel leaving and holding a sack. Surveillance footage from Monti and Associates, a business near Addison Auto Body Shop, showed the Jeep arriving shortly after.

¶ 10 Before the Jeep arrived, the Monti footage captured a white sedan pulling into the parking lot. Detectives cross-referenced the footage with traffic camera footage and identified the white sedan as a Chevy Malibu with Illinois plates matching the address on Zalewski's driver's license.

¶ 11                                    *Addison Auto*

¶ 12 Jose Hernandez-Martinez, a mechanic at Addison Auto, testified that he was at the shop that night with Saul Martinez and David Magana. Zalewski came in multiple times between 10:00 and 10:30 p.m. The State played surveillance footage from inside Addison Auto during that time. Zalewski entered, left briefly, and returned, taking white cloth gloves from a shelf and asking Hernandez-Martinez for gasoline and rags, which Zalewski couldn't find. Zalewski left, returning a third time moments later wearing the white gloves. He grabbed his "drug bag" containing "weed" and left, only to quickly reenter for the rags and gasoline but ultimately leave again without them.

¶ 13 Hernandez-Martinez, Martinez, and Magana all testified that they did not hear gunshots or other noises because the shop was noisy. They did not notice blood on Zalewski or see him with a gun. All three witnesses mentioned seeing a Jeep alongside a white Chevy Malibu in the parking lot but could not identify the driver. Hernandez-Martinez testified that when he, Magana, and Martinez left for the night, he saw Zalewski still hanging around the shop.

¶ 14                              *Monti Footage and Narration*

¶ 15 The State relied heavily on surveillance footage from two Monti cameras pointed toward Addison Auto—referred to as "Monti 4" and "Monti 10." The court denied Zalewski's motion to bar the videos from evidence as unreliable due to their low quality and gaps.

¶ 16     The State played the videos during the testimony of Detective Ryan, who was the lead detective on the case. The court allowed Ryan to narrate the 49-minute footage.

¶ 17     Zalewski objected to the narration, arguing that it constituted inadmissible lay opinion testimony, but the court overruled the objection. Still, the trial court cautioned Ryan to focus on specific areas of the video and refrain from offering personal opinions on who appeared in the videos, what they were doing, or to whom the vehicles belonged.

¶ 18     Zalewski renewed his objection, contending that Ryan did not have a special position to explain what the videos depicted. The court denied this objection, explaining, "There's nothing wrong with stopping a 49-minute video when there's something that happened that took place in a second or two to call attention to a certain area of the video." The defense obtained a standing objection to the videos, all related footage, and Ryan's narration.

¶ 19     During Ryan's narration, he called attention to an individual entering the Jeep's passenger side, followed by "flashes of light" inside. He also referenced someone moving back and forth between the body shop and the Jeep's passenger side as well as the movement of various vehicles.

¶ 20                                    *Compilation Video*

¶ 21     The State introduced a compilation video into evidence that traced the movements of the Chevy Malibu, Zalewski, and the Jeep throughout the night. This video included footage from surveillance cameras at two other businesses near Addison Auto, Addison Auto's internal cameras, nearby traffic cameras, a Cinnamon Cove resident's camera, and a cell phone camera from another resident.

¶ 22     The events depicted in the compilation video, as described by Ryan:

> 10:01 p.m.: A Jeep arrives and parks in front of Addison Auto.
> 10:06 p.m.: A white sedan arrives and parks nearby, east of the shop.

10:08 p.m.: The Jeep moves and parks behind the sedan.

10:12 p.m.: Zalewski is seen inside the shop, talking to someone, then leaving.

10:13 p.m.: Someone gets into the Jeep's passenger side. Moments later, flashes of light are visible inside the Jeep.

10:14 p.m.: The same person gets out of the Jeep's passenger side.

10:16 p.m.: Zalewski reenters the shop and takes a pair of gloves.

10:17 p.m.: Zalewski leaves the shop again.

10:18 p.m.: A person enters the Jeep's passenger side.

10:21 p.m.: A person walks from the Jeep to the sedan, then to the shop entrance.

10:21 p.m.: Zalewski enters the shop and grabs his bag.

10:22-24 p.m.: A person walks around the sedan and nearby vehicles.

10:24 p.m.: Zalewski is inside the shop asking for gasoline and rags.

10:27 p.m.: Zalewski leaves the shop.

10:27 p.m.: Someone briefly gets into the Jeep's passenger side, then gets out and walks toward the sedan, which moves back a few feet and stops.

10:28-29 p.m.: A person moves between the Jeep and the sedan. The Jeep backs up a few feet and stops.

10:29 p.m.: While the Jeep backs up, a Ford Focus, driven by Magana, disappears.

10:29 p.m.: The sedan also reverses and parks in front of the shop. At the same time, a minivan driven by Hernandez-Martinez and Martinez leaves the area.

10:29 p.m.: A person gets out of the sedan and into the Jeep.

10:30 p.m.: Hernandez-Martinez and Martinez return to lock a truck parked in front of the shop.

10:30-31 p.m.: The Jeep moves forward a few feet, stops, and someone gets out, then gets into the sedan. Hernandez-Martinez testifies he saw Zalewski get into a white Chevy Malibu.

10:31 p.m.: The sedan goes westbound on Addison Ct. toward Busse Rd.

10:31 p.m.: The minivan also drives off.

10:31 p.m.: The sedan turns south on Busse Rd.

10:32 p.m.: The sedan, with Illinois plates E429876, turns right onto Oakton St.

10:42 p.m.: The sedan drives back north on Busse, then turns onto Addison Ct.

10:43 p.m.: The sedan drives east on Addison Ct and parks next to the Jeep with visible activity near the Jeep.

10:44 p.m.: The sedan goes west on Addison Ct. toward Busse with its headlights off.

10:45 p.m.: The sedan turns south onto Busse Rd. and then right onto Oakton

10:54 p.m.: The sedan goes north on Busse Rd. past Addison Ct. and turns left onto Chariot Court.

10:43-45 p.m.: Someone is seen walking around the Jeep parked on Addison Ct.

11:45 p.m.: The Jeep drives west on Addison Ct. toward Busse Rd. and stops briefly near Osco Petroleum then continues west.

11:51 p.m.: The Jeep turns north onto Busse Rd.

11:55 p.m.: The Jeep appears on a security camera at Cinnamon Cove, about a mile north of Busse Rd. and turns right.

Midnight: The Jeep is on fire in the Cinnamon Cove parking lot.

12:08 a.m.: The sedan goes south on Busse Rd. from Chariot Court.

12:09 a.m.: The sedan, with Illinois plates E429876, turns right onto Oakton.

¶ 23    Ryan also described the apartment complex layout, consisting of Cinnamon Cove, Forest Cove, and Pharaoh's Cove. The Jeep burned at Cinnamon Cove, which connects to Forest Cove by a footbridge. Pharaoh's Cove is less than a mile from Cinnamon Cove, with Busse Rd. as the main connecting route.

¶ 24                                         *Cell Phone Analysis*

¶ 25    An expert in digital forensics and cell phone site analysis testified regarding Zalewski's and Esquivel's phone records. The records reveal that Esquivel's last outgoing call was to Zalewski moments before the Jeep arrived at Addison Auto. Zalewski received the call about four miles away at 9:58 p.m. The last text message from Esquivel's phone was sent 14 minutes later.

¶ 26    Testimony revealed that Esquivel's cell phone was at Addison Auto until about 10:35 p.m. For some time after that, Esquivel's cell phone location was tracked with that of Zalewski and the movements of the Chevy Malibu as depicted in the compilation video. The expert testified that activity from Zalewski's and Esquivel's cell phones ceased at 11:47 p.m.

¶ 27                                         *2 E Berkshire Lane*

¶ 28    The State presented bullet fragments, unfired 9mm rounds, and spent 9mm shell casings recovered from the basement of 2 E Berkshire Lane under a warrant. Expert testimony revealed that the casings in the basement came from the same gun found in Esquivel's Jeep. Zalewski moved to suppress, arguing that the warrant failed to describe the items with sufficient particularity and lacked probable cause, and he did not live at that residence, which was his parents' house.

¶ 29    The trial court denied the motion to suppress. Several of the State's witnesses established that a surveillance team had seen Zalewski enter the residence after the murder and before his arrest, and his driver's license listed the residence.

¶ 30                                              *Arrest*

¶ 31    Officers testified that they set up a fake drug deal at Addison Auto to facilitate Zalewski's arrest five days after the murder. When they boxed in his Chevy Malibu, Zalewski slammed his car into the officers' cars, moving forward and backward until giving up. Officer testimony revealed that a large plastic bag of marijuana was in the trunk with writing in a Sharpie that resembled the bags of marijuana found at Esquivel's apartment.

¶ 32                                      *Defense Witnesses*

¶ 33    Zalewski presented an expert in audio-visual analysis to rebut that the flashes of light were muzzle flashes. The expert testified that the flashes were not the result of a gun discharging but from other light sources in the area or originated from the camera. He noted the "extremely poor" quality of the Monti footage and that he could not discern anyone's identity.

¶ 34    The defense called a Cinnamon Cove resident who testified that she saw six or seven people outside about 30–40 minutes before her husband noticed a Jeep burning in the parking lot.

¶ 35                                             *Verdict*

¶ 36    The jury found Zalewski guilty of first-degree murder, concealment of a homicidal death, and possession of a controlled substance. The trial court denied his motion for a new trial.

¶ 37                                             Analysis

¶ 38    Zalewski argues (i) the trial court erred by denying his motion to suppress, (ii) the evidence was insufficient to sustain a conviction for murder, (iii) the court erred by allowing Ryan to narrate

the surveillance footage, (iv) the court erred by admitting the surveillance footage, and (v) trial counsel was ineffective.

¶ 39                                    *Fourth Amendment*

¶ 40    Zalewski argues the trial court erred by refusing to suppress the shell casings found at 2 E Berkshire due to a lack of probable cause. He claims that the warrant did not establish a nexus between the crime and the location to be searched and that descriptions of the items to be seized were overly broad. We disagree.

¶ 41    A search warrant requires probable cause, supported by an affidavit that describes the place and the things to be seized with particularity. U.S. Const., amend. IV. Probable cause exists if the facts stated in an affidavit would cause "a reasonable person to believe a crime has been committed and evidence of that crime is in the place to be searched." *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 48. The affidavit must establish a nexus—directly or through reasonable inferences––between the criminal offense, the items sought, and the place to be searched. *Id.* The issuing judge makes a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit," a "fair probability" exists that evidence of a crime will be found in a specific place. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).

¶ 42    When assessing a motion to suppress evidence for failure to establish probable cause, courts afford great deference to the judge who issued the warrant and resolve any doubts in favor of upholding the warrant. *United States v. Leon*, 468 U.S. 897, 914 (1984). On appeal, the reviewing court defers to the trial court's findings of fact, which can only be reversed if they are against the manifest weight of the evidence. *People v. Cregan*, 2014 IL 113600, ¶ 22. We review the trial court's legal conclusion *de novo*. *Cregan*, 2014 IL 113600, ¶ 22.

¶ 43    The warrant established probable cause. It provided a detailed overview of the facts, evidence, and context of Esquivel's murder known at the time, including Zalewski's relationship with Esquivel and multiple connections to 2 E Berkshire. Police found Esquivel's burning Jeep at Cinnamon Cove after a reported explosion. Inside, officers discovered Esquivel's body with three gunshot wounds, 9mm shell casings, and a melted container of flammable liquid. Footsteps in the snow led away from the scene.

¶ 44    Surveillance linked Esquivel's Jeep and a Chevy Malibu to Addison Auto shortly before the fire, with flashes visible from the Jeep. Officers identified Zalewski, who they knew from earlier investigations. A license plate reader traced the Malibu to 2 E Berkshire, where Zalewski was later seen. Cell phone records showed a call from Esquivel to Zalewski on the night of the murder.

¶ 45    Given "all the circumstances set forth in the affidavit," a "fair probability" supports the conclusion that evidence of Zalewski's connection with the murder would be at the residence. See *Gates*, 462 U.S. at 238–39; *Rodriguez*, 2018 IL App (1st) 121379-B, ¶ 49 ("[I]t is reasonable to infer * * * that a person will generally keep possessions, including possessions that link that person to the crime, in his or her home.").

¶ 46    Additionally, the warrant sufficiently limited the search to evidence "used in the commission of, or which constitute evidence of the offense of first-degree murder." The warrant requested evidence related to (i) an "incendiary act" with the use of "ignitable liquids and/or substances," and (ii) "the commission of an arson, homicide, or other criminal offenses," including "clothing, footwear, and forensics," cell phones and electronics, blood and fingerprint evidence,

and DNA, and firearms, ammunition, cannabis, credit/debit cards issued to Zalewski, and property tending to establish his residency.

¶ 47    While a warrant must describe the items with sufficient particularity, officers need not know every piece of evidence beforehand. Describing characteristics of an item rather than identifying specific items suffices. See *People v. McCarty*, 223 Ill. 2d 109, 152 (2006) (upholding warrant directed at "items associated with the use, manufacture, and distribution of methamphetamine" instead of particular items). The warrant connects Zalewski to Esquivel before and the night of the murder. It also connects Zalewski to 2 E Berkshire. Reasonable inferences support a nexus between the murder, the items listed, and the residence. See *Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 48.

¶ 48    Still, Zalewski contends that the evidence should be suppressed because Detective Ryan showed reckless disregard for the truth in establishing probable cause. He argues that Ryan misleadingly identified Esquivel's Jeep, Zalewski, and muzzle flashes in the video footage. According to Zalewski, the footage was "indecipherable," arguing that Ryan's narrative displayed a reckless disregard for the truth and undermined reliance on the good-faith exception.

¶ 49    Nonetheless, the issuing judge could have found probable cause based on (i) the other surveillance footage, (ii) cell phone records, (iii) Facebook records establishing a relationship with Esquivel, (iv) receipt of Esquivel's last call shortly before the murder, (v) traffic-camera footage, and (vi) a license plate reader. In addition, the warrant describes evidence of drug involvement, a possible motivation connecting him with Esquivel.

¶ 50    Zalewski further argues that to establish probable cause, Detective Ryan deliberately omitted evidence that Zalewski did not live at 2 E Berkshire. He claims that Ryan knew that

Zalewski lived with his girlfriend and that a surveillance team had followed him there. That said, Zalewski's driver's license listed that residence, as did his phone records and car registration. Nor is there evidence that Ryan deliberately misrepresented Zalewski's residence. Many people reside in multiple locations and may reasonably consider their partner's place and parent's house "home."

¶ 51 Lastly, Zalewski claims that the warrant included unfounded suspicions and allegations concerning his character as a violent person. The warrant explained that detectives recognized Zalewski as a suspect in other violent crimes and narcotics sales. Zalewski argues that those suspicions never led to an arrest, so the affidavit impermissibly suggests that he was involved in other crimes based on opinion.

¶ 52 Assuming for argument purposes, that this describes an error, not every fact recited in a warrant affidavit need be correct, " 'for probable cause may be founded upon hearsay * * * as well as upon information within the affiant's own knowledge[.]' " *People v. Chambers*, 2016 IL 117911, ¶ 61 (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)). The information must be believed or " 'appropriately accepted' " by the affiant as true. *Chambers*, 2016 IL 117911, ¶ 61 (quoting *Franks*, 438 U.S. at 165). Nothing indicates that Detective Ryan deliberately misled the issuing judge or displayed a reckless disregard for the truth.

¶ 53                                   *Sufficiency of the Evidence*

¶ 54 Zalewski argues the State failed to prove beyond a reasonable doubt that he killed Esquivel and concealed his death. The circumstantial evidence, however, supports his convictions.

¶ 55 The standard of review requires that the evidence be viewed in the light most favorable to the prosecution such that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

Circumstantial evidence alone can sustain a criminal conviction. *People v. Jackson*, 232 Ill.2d 246, 281 (2009). Each piece of evidence need not satisfy the trier of fact beyond a reasonable doubt; the trier of fact may consider all the evidence taken together. *Id.*

¶ 56    The State presented extensive video evidence placing both Zalewski and Esquivel's Jeep at Addison Auto the night of the murder. Surveillance footage showed an individual entering the passenger side of the Jeep several times. Witness testimony revealed that Zalewski went into Addison Auto several times as well. The footage from inside Addison Auto and the lower-quality Monti footage could suggest Zalewski left the shop and got into the passenger side of the Jeep.

¶ 57    Tracking data revealed that Esquivel's cell phone matched Zalewski's movements as Zalewski drove around the area later that night while Esquivel's Jeep remained at Addison Auto. Video indicates that Esquivel never left his Jeep or entered Zalewski's car. That Esquivel's gunshot wounds were on his right side, fired within one-foot, suggests Esquivel was shot while in the Jeep.

¶ 58    Further, the compilation video provided a timeline of Zalewski's and the Jeep's movements. Surveillance footage, red light camera footage, and evidence of cell phone tracking all placed Zalewski near the Cinnamon Cove apartments when the Jeep caught fire. It is reasonable to conclude, then, that Zalewski sought rags and gasoline to cover up the murder. Footprints in the snow at Cinnamon Cove leading from the Jeep to a nearby building and a traffic camera footage showed a Malibu traveling away from the complex shortly after flames engulfed the Jeep.

¶ 59    The State also presented shell casings found at 2 E Berkshire with the same identifying marks as those found in the Jeep. A surveillance team followed Zalewski to this residence on the day of his arrest. Later that day, Zalewski attempted to flee officers who had cornered his car at Addison Auto. Zalewski repeatedly rammed into the officers' vehicles until giving up. After his

arrest, officers discovered a bag of marijuana in the trunk, resembling those found at Esquivel's apartment.

¶ 60    Zalewski claims that DNA or physical evidence are necessary for conviction. He also points out that (i) the shell casings taken from Esquivel's car were not dusted for fingerprints, (ii) his shoes did not match the footprints in the snow, (iii) broken glass from the Jeep's window was never found, and (iv) a murder weapon was never retrieved. In addition, the search of his car did not turn up Esquivel's blood or DNA.

¶ 61    Zalewski's arguments are flawed. "Physical evidence connecting a defendant to a crime has never been required to establish guilt." *People v. Williams*, 182 Ill.2d 171, 192 (1998). For example, in *People v. Hernandez*, the jury found the defendant guilty of murder and residential burglary, among other offenses. *People v. Hernandez*, 121 Ill. 2d 293, 295 (1988). The State did not present evidence of fingerprints or blood on the defendant's clothes or shoes or assert that the defendant's shoes matched prints found near the victim's body. *Hernandez*, 121 Ill. 2d at 305. There were no eyewitnesses, and a murder weapon was never found. *Id.* at 299–300. Yet, the supreme court affirmed, noting it "has never required proof of physical evidence connecting a defendant to a crime in order to establish his guilt." *Id.* at 319; see also *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 15 (affirming convictions of aggravated unlawful use of weapon and unlawful use of weapon by felon despite no physical evidence connecting defendant to gun).

¶ 62    Next, Zalewski asserts that the testimony of Hernandez-Martinez, Martinez, and Magana favored innocence because none of them (i) heard gunshots, (ii) saw Zalewski with a gun, or (iii) saw blood on Zalewski. But Zalewski's contention ignores critical parts of the testimony. Martinez and Magana testified that the shop was noisy. Hernandez-Martinez testified that Zalewski came

into the shop to buy gloves, left briefly, and came back looking for gasoline and rags. A jury could reasonably conclude guilt from the totality of these witnesses' testimony.

¶ 63    The trier of fact draws reasonable inferences from the evidence. Zalewski does not argue that the inferences were unreasonable but wrong. Even so, we do not determine whether inferences are right or wrong so long as they are rational. See *People v. Jackson*, 232 Ill.2d 246, 280–81 (2009) (reviewing court will not substitute its judgment for factfinder's on questions involving weight of evidence). For instance, Zalewski argues that it would be a "virtual impossibility" to avoid getting blood on himself if the State's theory of the close-range shooting and moving of the body is correct. Even if the jury were to accept this as true, it would have been reasonable to infer that the gloves were used to cover blood on his hands, that he changed clothes, or that he used the rags to wipe blood off himself before reentering the shop. Again, that these items were used to cover up the murder and set fire to the Jeep constitutes a reasonable inference.

¶ 64    Zalewski asserts that the messy state of his car indicates that no DNA evidence existed in it. But the jury could have inferred that his car was cleaned and dirtied again between the murder and his arrest five days later. Further, that the bullets in Esquivel's car and those from the basement of Zalewski's residence were not dusted for fingerprints might reflect an inadequate investigation. Alternatively, the jury could have believed that the bullets in the car were too burned to lift fingerprints, while those in the basement linked Zalewski without fingerprint identification.

¶ 65    To support the defense's theory that the murder occurred elsewhere, Zalewski raises the Jeep's smashed window and the lack of broken glass at Addison Auto or Cinnamon Cove. The jury could infer that the window was broken elsewhere, or that glass from the Jeep could have blended with other glass near the auto shop.

¶ 66    Lastly, Zalewski highlights that his shoes don't match the footprints in the snow and that no murder weapon was found. But the jury is not required to "disregard inferences which flow normally from the evidence before it" or consider every possible innocent explanation. *People v. Jackson*, 232 Ill.2d 246, 281 (2009); *People v. Wheeler*, 226 Ill.2d 92, 117 (2007).

¶ 67                                    *Admissibility of Monti Videos*

¶ 68    Zalewski contends that the trial court erred by admitting the Monti #4 and Monti #10. The State responds that Zalewski waived his challenge to admissibility by acquiescing to their admission. This misstates the record. Zalewski made a standing objection to *all* footage pulled from Monti #4 and Monti #10.

¶ 69    Under the "silent witness theory," video footage can be introduced as substantive evidence as long as a proper foundation is laid. *People v. Taylor,* 2011 IL 110067 ¶ 32. A witness does not need to verify the accuracy of the images if the reliability of the process is established. *Taylor,* 2011 IL 110067 ¶ 32. With that foundation, the video—the so-called " 'silent witness' "— " 'speaks for itself.' " *Id.* (quoting Jordan S. Gruber, *Foundation for Contemporaneous Videotape Evidence*, *in* 16 Am. Jur. Proof of Facts 3d 493, § 4, at 507 (1992)). The State need not address every factor from *Taylor* to lay a proper foundation under the silent witness theory. See, e.g., *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 28 (finding three *Taylor* factors sufficient to admit video evidence under silent witness theory).

¶ 70    Reliability involves evaluating six non-exhaustive factors identified in *Taylor*: (i) the device's capability for recording and general reliability, (ii) operator competency, (iii) proper operation, (iv) chain of custody, (v) identification of depicted persons, locale, or objects, and (vi) explanation of copying or duplication processes. *Taylor,* 2011 IL 110067, ¶ 32. Not all factors

need to receive equal weight. *Id.* ¶¶ 35, 46 (finding proper foundation for admission of video tape based on "totality of the evidence"). The factors guide the analysis but do not determine the outcome. The core issue involves the accuracy and reliability of the recording process. *Id.* ¶ 35. We review the trial court's decision under the abuse of discretion standard. *Id*. ¶ 27.

¶ 71    We find no abuse of discretion. The State laid a proper foundation. The Monti & Associates office manager testified that cameras, there since 2001, were serviced annually. She said she knew how the cameras worked and operated and said the cameras were accurate and reliable, except for a time stamp that ran fast. As to the fourth *Taylor* factor, chain of custody, she explained that she let detectives into the office and gave them access to the recordings. No evidence suggests anyone other than the office manager and the detectives obtained or had access to the footage.

¶ 72    Still, Zalewski argues that the State did not establish a proper foundation under *Taylor* based on Zalewski's audio-visual expert. His expert testified that the videos' quality was too low to support the identification of individuals, vehicles, or the flash. This argument has little relevance to admissibility. As the trial court stated, and we agree, the expert's opinion is best reserved for "argument that could be made at trial or issues that could be brought out through cross-examination but aren't necessarily persuasive as [to] admissibility." The trial court, not an expert witness, decides admissibility.

¶ 73    Zalewski contests the surveillance camera's functionality, claiming it cut out unpredictably, and failed to record when it should have. He cites two instances when the motion-activated cameras briefly stopped as an individual was mid-movement.

¶ 74    Short skips do not render the video untrustworthy under the first and third *Taylor* factors. In *Taylor*, the court addressed a similar contention and found that missing segments from a motion-

sensor surveillance camera were "not fatal to a finding that the camera was working properly." *Taylor*, 2011 IL 110067, ¶ 39. The court noted that the video's very existence was evidence the camera worked in some capacity. *Id.* ("While the camera may not have worked perfectly, it clearly worked.").

¶ 75    Zalewski next questions the fourth *Taylor* factor. He notes that the office manager gave the surveillance tapes to the police without watching it first. From this, he suggests the possibility of doctoring. Not only does he offer no evidence for this theory, he erroneously claims that the court in *Taylor* admitted the video "only after the foundational witness confirmed that the recording shown in court was the same as the one he watched before it went into the state's custody."

¶ 76    The *Taylor* court discussed each factor at length. See *Taylor*, 2011 IL 110067, ¶¶ 37–44 (State adequately demonstrated operator's competence by showing "camera and system were able to record and were generally operating properly," explaining copying process, and that edits did not suggest tampering or fabrication). Strict chain of custody proof is unnecessary if other factors prove reliability. *Id.* ¶ 41. Without specific accusations or evidence, "the State [is not required to] exclude every possibility of tampering or contamination." *People v. Alsup*, 241 Ill. 2d 266, 275 (2011). Besides, gaps in the chain of custody go to the issue of weight, not admissibility. *Id.*

¶ 77                        *Lay Opinion of Monti Videos*

¶ 78    Zalewski argues that the trial court erred in allowing Detective Ryan to narrate the Monti surveillance footage, citing Illinois Rule of Evidence 701, which governs the admission of lay opinion testimony. Again, we disagree.

¶ 79    Lay opinion identification testimony admissibility under Illinois Rule of Evidence 701 depends on "(a) the testimony [being] rationally based on the perception of the witness and (b) the

testimony [being] helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *People v. Thompson*, 2016 IL 118667, ¶ 50. "Helpful" means "some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Thompson*, 2016 IL 118667, ¶ 50. Testimony may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 80    We review the trial court's decision to admit lay opinion testimony under an abuse of discretion standard. *People v. Thompson*, 2016 IL 118667, ¶ 49. An abuse of discretion occurs when the trial court's ruling is "fanciful, unreasonable or when no reasonable person would adopt the trial court's view." *People v. Taylor*, 2011 IL 110067, ¶ 27.

¶ 81    The trial court did not abuse its discretion by admitting Ryan's testimony regarding the Monti videos. First, Ryan's testimony was rationally based on his perception of the videos and the area surrounding Addison Auto. *Thompson*, 2016 IL 118667, ¶ 60 (testifying witness need not have been present at scene depicted in video for testimony to be rationally based on their perception).

¶ 82    Second, Ryan's testimony helped draw the jury's attention to events in the video that might have gone unnoticed. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 77 (holding narration of complex surveillance video helpful to jury under *Thompson* standard). Ryan was familiar with the area, the Monti camera locations, and their geographic coverage. Given that the images were grainy and the timestamps inaccurate, the narration was necessary. *Mister*, 2016 IL App (4th) 130180-B, ¶ 77 (narration helpful for video that lacked clarity, difficult to assess, and with fluid scenes of many subjects and vehicles). Ryan reviewed the video multiple times before testifying

and helped create the compilation. *Id.* (narrating witness had to watch four-hour video several times to master its contents, which court found "extremely inefficient" use of jury's time). Ryan was better positioned than the jury to identify crucial actions in the compilation.

¶ 83    Moreover, the trial court limited Ryan's testimony to relevant portions. The court explained that "[t]here's nothing wrong with stopping a 49-minute video when there's something that happened that took place in a second or two to call attention to a certain area of the video." Ryan's testimony fell within these boundaries. He referred to individuals as "subjects" and did not connect Zalewski or Esquivel to the vehicles. He pointed out the direction in which vehicles were traveling to the surrounding area. And he highlighted events that were difficult to discern without offering an opinion on the significance of the events.

¶ 84    Yet, Zalewski contends that Ryan's testimony did not adhere to the trial court's safeguards and invaded the province of the jury. He argues Ryan's testimony was unduly prejudicial under Illinois Rule of Evidence 403 because he implied the flashes were muzzle flashes, and only an expert could identify the source of the flashes. We disagree.

¶ 85    By referring to the flashes as "inside" the Jeep, Ryan described where the jury was to look. One need not be an expert to point to flashes of light in a video, and Ryan never said the flashes were muzzle flashes. The jury was free to draw its own conclusions about the origin of the flashes, just as they were free to consider the testimony of Zalewski's expert, who said they were not muzzle flashes. *Id.* ¶ 78 (weight given to lay opinion testimony is for jury to decide). Ryan's comment did not invade the province of the jury.

¶ 86   Additionally, Illinois Rule of Evidence 403 bars *unfairly* prejudicial evidence. Ill. R. Evid. 403 (eff. Jan. 1, 2011). Ryan's testimony consisted of innocuous narration of complicated surveillance footage.

¶ 87   Zalewski further contends that the trial court erred in allowing Ryan to identify a vehicle as a Jeep. He claims that the identification went to a material fact in the prosecution's case— Esquivel's presence at Addison Auto.

¶ 88   "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Ill. R. Evid. 704 (eff. Jan. 1, 2011). Ryan never referred to the Jeep—an easily identifiable type of vehicle—as Esquivel's. Nor did he mention identifying marks that could link the Jeep to Esquivel. The identification called attention to an event depicted in the video, which properly assisted the jury, given the video's poor quality and length. The jury remained free to decide whether the Jeep belonged to Esquivel.

¶ 89   Lastly, Zalewski claims that Detective Ryan's status as a police officer added unfair prejudice. Not so. Ryan offered no opinion about Zalewski's guilt or the significance of the footage. His testimony helped the jury understand the video's content. Thus, the cases Zalewski cites are distinguishable. Unlike here, in both cases, the officer's testimony invaded the province of the jury. See *People v. Sepka*, 51 Ill. App. 3d 244, 259 (1st Dist. 1997) (finding officer's testimony inadmissible when officer testified to "legal effect of facts already in evidence"); *People v. Crump*, 319 Ill. App. 3d 538, 574–75 (3rd Dist. 2001) (holding officer's testimony inadmissible when he—as authority figure—testified to belief defendant was guilty). Neither case implies that officers cannot provide lay opinion testimony. See also *Thompson*, 2016 IL 118667, ¶ 56 ("There is no *per se* rule against admission of a law enforcement officer's identification testimony.").

¶ 90                    *Ineffective Assistance of Counsel*

¶ 91    Both the federal and Illinois Constitutions guarantee a criminal defendant the right to effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. Ineffective assistance claims are analyzed under the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that the deficient representation resulted in prejudice. *Strickland*, 466 U.S. at 688. Prejudice means a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A *possibility* of prejudice is not enough. If a defendant fails to satisfy either prong, the ineffective assistance of counsel claim fails. Hence, a court need not analyze the deficiency of counsel's performance if sufficient prejudice is lacking. *People v. Johnson*, 2021 IL 126291, ¶ 53.

¶ 92    We review an ineffective assistance of counsel claim *de novo*. *Id.* ¶ 52.

¶ 93    Zalewski argues that he received ineffective assistance of counsel amounting to reversible error because his counsel should have objected to the publication of the video compilation as lacking foundation, implying a false narrative, and unduly prejudicial. The exclusion of the compilation video, he claims, would have resulted in a verdict of not guilty.

¶ 94    Even if counsel had managed to suppress the compilation video, the remaining evidence undercuts Zalewski's prejudice argument. Without the compilation, the cell phone data, ballistics evidence, and evidence of Zalewski and Esquivel's relationship remain. Detectives recovered a bag of marijuana from Zalewski's car resembling those found in Esquivel's apartment. Furthermore, Addison Auto employees testified that Zalewski requested gloves, gasoline, and rags hours before Esquivel was found murdered.

¶ 95    Most notably, the compilation consisted of the Monti surveillance footage, traffic camera footage, and footage from surrounding businesses, all admissible separately. The prosecution could have recreated the compilation's timeline by showing each video individually, an albeit onerous undertaking for the jury. Excluding the compilation may have made the jury's job harder, but that is not to say that the verdict would have been different.

¶ 96    Zalewski has not shown prejudice so his ineffective assistance of counsel claim fails.

¶ 97    Affirmed.